[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, David Galligan, has filed a four count complaint against the defendants, Edward D. Jones Company (Jones), a limited partnership organized and existing under the laws of the State of Missouri engaged in the business of providing financial services, and Donald Walter, a general partner of the limited partnership. In count one, Galligan alleges that his employment was wrongfully terminated by the defendants. Count two alleges that the defendants invaded Galligan's privacy by publicizing private facts about him. In count three, Galligan alleges invasion of privacy by "false light." Count four alleges defamation. Galligan amended his complaint to add count five, in which he alleges negligent infliction of emotional distress. CT Page 13783
Jones and Walter have filed a motion for summary judgment on all counts of the amended complaint. "Practice Book § 384 [now § 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.
In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . ." (Citations omitted; internal quotation marks omitted.) Appleton v. Board of Education, 254 Conn. 205, 209, ___ A.2d ___ (2000).
The parties posit two very different scenarios of the events triggering Galligan's. discharge from Jones' employment, thus leaving few matters for which no genuine issue of material fact exists. The following is substantially undisputed. Galligan was arrested in 1988 in Bridgeport, Connecticut for possession of marijuana and possession of drug paraphernalia, both misdemeanors. Galligan applied for and was granted accelerated pretrial rehabilitation pursuant to General Statutes §54-56e.[1] Galligan successfully completed the terms of his probation. Upon the successful completion of his probation, "all records" of the two charges against him were supposed to be "erased" by operation of law, pursuant to General Statutes (Rev. to 1987) §§ 54-56e(e) and 54-142a. Furthermore, upon the successful completion of his probation, Galligan was "deemed to have never been arrested within the meaning of the general statutes with respect to the proceedings so erased and [could] so swear under oath." General Statutes (Rev. to 1987) § 54-142a (e).
On February 17, 1994, Galligan and Jones entered into an "investment representative employment agreement." Galligan also completed a uniform application for securities industry registration or transfer form (U-4 form) as required in the securities industry before a person may work as an investment representative for firms such as Jones. Question 22 on the U-4 form asked whether the applicant had ever been convicted or plead "no contest" to a felony. Galligan answered "no" to these questions.
In accordance with the requirements of the securities industry, Galligan was fingerprinted and his fingerprints were sent to the United States Department of Justice, Federal Bureau of Investigation, CT Page 13784 Identification Division (FBI). The FBI subsequently reported to Jones that Galligan had been arrested on April 7, 1988 by the Bridgeport Police Department on the charges of possession of marijuana and possession of drug paraphernalia.
The following facts are in dispute. However, "[i]n deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party"; Witt v. St. Vincent's MedicalCenter, 252 Conn. 363, 368, 746 A.2d 753 (2000); who, in this proceeding, is Galligan. On July 22, 1994, Galligan received a "private wire" memo from Donna Quinn of Jones' Licensing Department telling him that he needed to disclose information on the U-4 form about an incident in April, 1988. On July 22, 1994, Galligan also received a telephone call from Nancy Neely, another Jones employee, telling him that she had information regarding an arrest. Galligan claims that he told Neely that her information was mistaken and that he would look into it. When Galligan inquired in Connecticut about the arrest referred to by Neely, he could not find a docket number or disposition of a case pertaining to him at the court. Jones and Walter argue that, in his conversation with Neely, Galligan denied that the person in the report was him and further told Neely that his wallet had been stolen and that someone was using his identity.
Galligan also claims that he asked Neely to what arrest she was referring. Neely told him to read the memo from Donna Quinn and to amend his answer to question 22 on the U-4 form to "yes." Galligan refused to answer yes to the question because he did not have a criminal record. Neely told the plaintiff he should speak with Donna Quinn.
In a subsequent telephone conversation, Neely informed Galligan that the incident to which she referred occurred in April, 1988. Galligan eventually admitted to Neely that he had been arrested for marijuana possession and had completed a special program in Connecticut. Neely then informed her supervisor, who involved Walter. Neely, Walter and Galligan had a telephone conference call about Galligan's background. The parties' versions of this telephone conversation differ. Galligan maintains that Walter asked him if he had ever been arrested for anything relating to question 22 on the U-4 form. Galligan answered in the negative. Walter next asked if Galligan had ever been arrested, and specifically referred to a marijuana charge. Galligan responded that there was an incident that was covered by accelerated rehabilitation and, therefore, he had never been arrested. Moreover, the incident was inapposite to any inquiry in question 22 of the U-4.[2] Galligan maintains that, when he explained to Walter that the accelerated rehabilitation law in Connecticut did not require him to answer yes to question 22 on the U-4 form, Walter said that he did not care about the law in Connecticut and that he was CT Page 13785 concerned with the laws of Missouri. Walter next asked Galligan if he had told Neely that someone was using his identity. Walter maintains that Galligan eventually conceded making the statement to Neely. Galligan, on the other hand, denies telling Walter that he told Neely that someone, in fact was using his name. Rather, Galligan maintains that he told Neely that someone using his identity was only a possibility.
Walter terminated Galligan for lying. On a Uniform Termination Notice for Securities Industry Registration (U-5 form), Walter wrote that Galligan "made a material misstatement to a member of the Compliance Department during an investigation." The reason given on the U-S for Galligan's termination is the basis of Galligan's claims in his complaint.
 I
In count one of his complaint, Galligan alleges that he was wrongfully terminated by Jones and Walter in violation of General Statutes (Rev. to 1987) §§ 54-56e and 54-142a (e). These statutes give a first-time offender of a non-serious crime the opportunity not to have a criminal record if he successfully completes a period of probation. The defendants move for summary judgment on count one on the ground that Galligan's claim is governed by Missouri law under which no reasonable jury could find for Galligan. Galligan argues that an earlier ruling by another judge of this court denying the defendants' motion to strike the complaint established the "law of the case" that Connecticut law applies to Galligan's claim of wrongful termination. The preliminary issues of law of the case and conflicts of law are addressed first.
 A.
Earlier in these proceedings, Jones and Walter moved to strike all counts of the complaint on the ground that the counts were legally insufficient. The court, Gray, J., denied the motion to strike without issuing a memorandum of decision. Galligan asserts that Judge Gray held that Connecticut law applies to Galligan's claim of wrongful termination.
"The law of the case . . . is a flexible principle of many facets adaptable to the exigencies of the different situations in which it may be invoked. . . . In essence it expresses the practice of judges generally to refuse to reopen what has been decided and is not a limitation on their power. . . . A judge should hesitate to change his own rulings in a case and should be even more reluctant to overrule those of another judge. (Citations omitted; internal quotation marks omitted.)State v. Arena, 235 Conn. 67, 80, 663 A.2d 972 (1995); see also Breen v.CT Page 13786Phelps, 186 Conn. 86, 99-100, 439 A.2d 1066 (1982). Yet, "[a] judge is not bound to follow the decisions of another judge made at an earlier stage of the proceedings, and if the same point is again raised he has the same right to reconsider the question as if he had himself made the original decision." (Internal quotation marks omitted.) Miller v.Kirshner, 225 Conn. 185, 191-92, 621 A.2d 1326 (1993).
The doctrine of law of the case does not apply here for two reasons. First, since Judge Gray simply denied the motion to strike the complaint without giving his reasons, it is not possible to divine the basis of his ruling. See Gould v. MB Motorsport, Superior Court, judicial district of Waterbury, No. 112515 (Nov. 30, 1994); Birdsall v. Insulation MaterialProducts, Superior Court, judicial district of New Haven, No. 32416 (May 4, 1992). Second, it was a motion to strike the complaint and not a motion for summary judgment that was before Judge Gray. A motion to strike challenges the legal sufficiency of a pleading and admits all facts well pleaded. Eskin v. Castiglia, 253 Conn. 516, 522, ___ A.2d ___ (2000). What is now before the court is a motion for summary judgment. "A trial court may appropriately render summary judgment when the documents submitted demonstrate that there is no genuine issue of material fact remaining between the parties and that the moving party is entitled to judgment as a matter of law. . . ." Inwood CondominiumAssociation v. Harold Winer, 49 Conn. App. 694, 697, 716 A.2d 139
(1998). Since a different standard applies to the motion for summary judgment, now before the court, than to the motion to strike that was before Judge Gray, the doctrine of law of the case is inapplicable;McCutcheon Burr, Inc. v. Berman, 218 Conn. 512, 525-26, 590 A.2d 438
(1991); and this court is not bound by the prior decision of Judge Gray.
 B.
The second preliminary issue is whether Connecticut or Missouri law applies to Galligan's wrongful termination claim. In support of their motion, the defendants argue that under Galligan's employment agreement, Missouri law governs this dispute. Paragraph 30 of that agreement states: "You understand that your employment with Jones shall be considered an `at will' arrangement in accordance with the laws of the State of Missouri. This means that you are free, as is Jones, to terminate the relationship at any time for any reason, so long as there is no violation of applicable federal or state law." Paragraph 27 of the agreement states: "This agreement shall be deemed to be a Missouri contract and governed by the laws thereof. . . . Any provision of this Agreement prohibited by the laws of any state shall as to such state be ineffectual only to the extent of such prohibition and shall not invalidate the remaining provisions of this Agreement." CT Page 13787
"A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. . . ." (Internal quotation marks omitted.) Tallmadge Bros. v. IroquoisGas Transmission System, 252 Conn. 479, 498, 746 A.2d 1277 (2000) "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact
[w] here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." Id., 495. Construing the investment representative employment agreement to effectuate the intent of Galligan and Jones, the court concludes that the agreement clearly contemplates that any dispute arising from the employment relationship is governed by the law of Missouri.
Whether to give effect to this choice of law provision is governed by the Restatement (Second), Conflicts of Law § 187. See Elgar v.Elgar, 238 Conn. 839, 850, 679 A.2d 937 (1996)." [I]n accordance with § 187 of the Restatement [(Second), Conflicts of Law] . . . parties to a contract generally are allowed to select the law that will govern their contract, unless either: (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188 [of the Restatement], would be the state of the applicable law in the absence of an effective choice of law by the parties." Id.; see also Zenon v. R. E. Yeagher Management Corp., 57 Conn. App. at 316-321,748 A.2d 900 (2000) ("[c]ontracts clauses which require the application of the laws of other states upon breach or dispute are recognized as proper in Connecticut").
There is no question that Missouri has a substantial relationship to Jones, an entity existing under its laws and where its principal place of business is located. Moreover, the decision to hire and the decision to fire Galligan was made in Missouri. Galligan offers no analysis under Restatement (Second), Conflicts of Law §§ 187 and 188 as to why application of Missouri substantive law would be contrary to the fundamental policy of Connecticut. For these reasons, this court concludes that the parties' choice of Missouri law in their investment representative employment agreement is valid and must be given effect. CT Page 13788
 C.
The defendants contend that, under Missouri law, the plaintiff cannot prevail on his action for wrongful discharge. Missouri adheres to the employment at will doctrine. Adolphsen v. Hallmark Cards, Inc.,907 S.W.2d 333, 335 (Mo.Ct.App. 1995). "Missouri's employment-at-will doctrine historically has permitted an employer to discharge an at-will employee, for cause or without cause, without liability for wrongful discharge, provided that the employee is not otherwise protected by a contrary statutory provision." Id. "[A] narrow public policy exception has been carved out for wrongful discharge for an at-will employee when an employer's act of discharging the employee is violative of a statute, regulation based on a statute, or a constitutional provision." Lynch v.Blanke Baer Bowey Krimko, 901 S.W.2d 147, 150 (Mo.Ct.App. 1995).
"Although the Missouri Supreme Court has not specifically adopted the public policy exception by name, it effectively established it in Smithv. Arthur Baue Funeral Home, 370 S.W.2d 249, 254 (Mo. 1963), and appeared to accept its expansion when in Johnson v. McDonnell Douglas Corp.,745 S.W.2d 661 (Mo. 1988)], it referred to the exception, but did not condemn or overturn the appellate decisions expanding it." Faust v. RyderCommercial Leasing Services, 954 S.W.2d 383, 389 (Mo.Ct.App. 1997) "The case of Boyle v. Vista Eyewear, Inc., 700 S.W.2d 859 (Mo.App. 1985) outlined the four categories of the public policy exception cases: (1) discharge of an employee because of his or her refusal to perform an illegal act; (2) discharge because an employee reported violations of law or public policy to superiors or public authorities; (3) discharge because an employee participated in acts that public policy would encourage, such as jury duty, seeking public office, asserting a right to collective bargaining, or joining a union; and (4) discharge because an employee filed a worker's compensation claim." Lynch v. Blanke Baer Bowey Krimko, supra, 901 S.W.2d 150.
Viewing the evidence in a light most favorable to Galligan as the nonmoving party, the court finds that the first and third exceptions to Missouri's employment at will doctrine apply to Galligan's claim. Galligan maintains that Jones insisted that he change his answer to questions 22A and 22B on the U-4 form from the negative to the affirmative.[3] Galligan refused to do so. The defendants do not claim that Galligan was ever convicted of an offense that falls within the gambit of questions 22A or 22B on the U-4 form. Galligan's arrest in 1988 was for possession of marijuana and drug paraphernalia, both misdemeanor charges. Furthermore, neither charge involved an investment-related business, fraud, false statements or omissions, wrongful taking of property, or bribery, forgery, counterfeiting, extortion or gambling. The U-4 form further requires an applicant to "swear or affirm . . . that my CT Page 13789 answers . . . are true and complete to the best of my knowledge." The form further states: "I understand that I am subject to administrative, civil or criminal penalties if I give false or misleading answers." Therefore, giving false answers to the questions asked on a U-4 form would be a crime. See, e.g., General Statutes § 53a-157b (person guilty of false statement in the first degree when he intentionally makes a false written statement on a certified payroll; false statement in the first degree is a class D felony). Based on the evidence Galligan has adduced in opposition to the defendants' motion, a jury could reasonably find that he was discharged for refusing to commit the crime of giving false answers on his U-4 form. Refusing to perform an illegal act at the employer's behest is an exception to Missouri's employment at will doctrine. See Olinger v. General Heating Cooling Co., 896 S.W.2d 43
(Mo.Ct.App. 1994) (plaintiff required to prepare and submit false rebate claims); Petersimes v. Crane Co., 835 S.W.2d 514, 515
(Mo.Ct.App. 1992) (plaintiff refused to violate 18 U.S.C. § 1001, making it a crime to make any false or fraudulent statements with respect to the business of a federal agency).
Second, based on the evidence Galligan adduces, a jury could reasonably find that he was discharged because, in reliance on General Statutes §§ 54-56e, 54-142a, he informed Jones that he had not been arrested in 1988 for the marijuana related offenses.[4] This portion of Galligan's argument implicates the third category of public policy exceptions to Missouri's at will employment doctrine, "discharge because the employee participated in acts that public policy would encourage. . . ." Boyle v.Vista Eyewear, Inc., supra, 700 S.W.2d 875. This exception has alternatively been characterized as "asserting a legal right." Lay v.St. Louis Helicopter Airways, Inc., 869 S.W.2d 173, 176 (Mo.Ct.App. 1993).
In arguing that this exception to the employment at will doctrine is inapplicable, the defendants rely on the Missouri Appellate Court's statement that "[w]e do not think that an employer's violation of any regulation, regardless of its content, necessarily triggers the limited public policy doctrine. Vague regulations may not be sufficiently clear to make enforcement practicable through employment-related litigation." (Emphasis in original.) Adolphsen v. Hallmark Cards, Inc., supra, 907 S.W.2d 338.
Here, however, the laws implicated by Galligan's claim of wrongful discharge are not just "any regulation." They are statutes which clearly provided that Galligan was deemed to have never been arrested and was entitled to so swear. General Statutes (Rev. to 1987) §§ 54-563,54-142a. While the statutes do not explicitly prohibit an employer from discharging an employee who relies on its provisions, they need not do so CT Page 13790 in order to express an enforceable public policy. See Porter v. ReardonMachine Co., 962 S.W.2d 932, 939 (Mo.Ct.App. 1998) (plaintiff not required to show that his discharge was explicitly prohibited by statute). The right of a person to claim that he was never arrested would be thoroughly subverted if he could lose his job for so claiming.
The defendants further argue that Galligan's discharge does not violate public policy because it does not implicate the public good of Missouri. They maintain that a violation of a Connecticut statute that inures only to the benefit of Galligan simply is not injurious to the public of Missouri or the Missouri public good and is, therefore, not actionable. The court disagrees. First, no Missouri Appellate Court has held that an actionable wrongful discharge requires that the public policy violated by the employer must be that of the state of Missouri. Second, it would be difficult to reconcile such a rule with Restatement (Second)1 Conflicts of Law, § 187. Third, the parties' contract contemplates that foreign law may be applicable. The contract states: "Any provision of this Agreement prohibited by the laws of any state shall as to such state be ineffectual only to the extent of such prohibition and shall not invalidate the remaining provisions of this Agreement."[5]
Finally, the court is not persuaded that the law in question, General Statutes (Rev. to 1987) § 54-142a, does not inure to the public good. A principal purpose of Connecticut's erasure law has been to facilitate the employment of persons whose records are erased. Proceedings of State Senate, Monday, July 17, 1974, p. 2776 (remarks of Sen. Joseph Fauliso); proceedings of House of Representatives, April 22, 1974, p. 3052 (remarks of Rep. Fabrizio). Facilitation of the employment of persons whose records are erased was a principal purpose of the amendment to the law in 1967, permitting a person whose records were thus erased to swear under oath that he had never been arrested. Proceedings of House of Representatives, May 8, 1967, p. 1761 (remarks of Rep. Carl R. Ajello). Although it was not until 1982 that the legislature enacted the amendment providing for the erasure of records of charges upon dismissal pursuant to accelerated rehabilitation; 1982 Public Act No. 82-9; and although the history of that legislation is unilluminating; see proceedings of Senate, March 10, 1982, pp. 253-256, 253-266; proceedings of House of Representatives, March 3, 1982, pp. 225-232; the court safely assumes that the same purpose motivated the legislature in having dismissals pursuant to accelerated rehabilitation treated under the erasure law, General Statutes § 54-142a, in the same manner as other dismissals.
The court holds that there are genuine issues of material fact precluding summary judgment for Jones and Walter on Galligan's claim of wrongful discharge in count one, based on the public policy exceptions to CT Page 13791 Missouri's employment at will doctrine. The motion for summary judgment as to count one is denied.
 II
In count two of the amended complaint, Galligan alleges that Jones and Walter invaded his privacy by giving publicity to a portion of his private life. Galligan's claim in count two is based on the defendants' filing of the U-S form that stated that Galligan made a material misstatement to a member of Jones' compliance department. Jones and Walter move for summary judgment on count two on the ground that no reasonable jury could find for Galligan on this cause of action. Specifically, Jones and Walter argue that no reasonable jury could find that they published information about Galligan that was private, rather than public. The court agrees.
"Our Supreme Court has described the four types of invasion of privacy: (1) appropriation, for the defendant's benefit or advantage, of the plaintiff's name or likeness; (2) intrusion upon the plaintiff's physical solitude or seclusion; (3) publicity, of a highly objectionable kind, given to private information about the plaintiff even though it is true and no action would lie for defamation; and (4) publicity which places the plaintiff in a false light in the public eye." (Internal quotation marks omitted.) Honan v. Dimyan, 52 Conn. App. 123, 132,726 A.2d 613, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999). Count two implicates the third species of invasion of privacy, giving unreasonable publicity to a matter concerning another's private life. Such "a tort action is triggered by public disclosure of information that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Perkins v. Freedom of Information Commission,228 Conn. 158, 172, 635 A.2d 783 (1993); 3 Restatement (Second), Torts 652D (1977).
The defendants contend that the statement on the U-5, that Galligan made a material misstatement to a member of Jones' compliance department, does not publicize private information about Galligan.[6]
The court agrees. "Comment (b) of § 652D [of the Restatement] describes the types of personal and private information that are given protection under the law of torts: Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends. Sexual relations, for example, are normally entirely private matters, as are family quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a man's life in his home, and some of his past history that he would rather forget. CT Page 13792 When these intimate details of his life are spread before the public gaze in a manner highly offensive to the ordinary reasonable man, there is an actionable invasion of his privacy, unless the matter is one of legitimate public interest." (Internal quotation marks omitted.) Perkinsv. Freedom of Information Commission, supra, 228 Conn. at 172-73.
Whether Galligan made a material misstatement to a member of Jones' compliance department during an investigation is not a private matter. Statements made by Galligan to Jones' compliance department and Jones' opinion as to their veracity pertained to Galligan's employment and his qualification to serve in a highly regulated industry in which veracity and personal integrity are essential. For this reason, the defendants are entitled to summary judgment on count two.
 III
The defendants move for summary judgment on counts three and four of Galligan's complaint on the ground that no reasonable jury could find for Galligan on these causes of action. Count three sounds in invasion of privacy by placing a person in a "false light"; count four sounds in defamation. Specifically, Jones and Walter argue that reporting on the U-S form that Galligan made a misstatement to Jones' compliance department is absolutely privileged or, in the alternative, conditionally privileged and that no reasonable jury could find that the conditional privilege had been abused by Jones or Walter.
 A.
In count three, Galligan alleges that he was falsely accused of being dishonest and having a criminal record, accusations that are highly offensive to a reasonable person. Galligan further alleges that the defendants were aware of or acted in reckless disregard as to the falsity of the publicized accusations and thereby placed him in a false light. Galligan's claim in count three implicates the third type of invasion of privacy, publicity placing the plaintiff in a false light in the public eye. Honan v. Dimyan, supra, 52 Conn. App. at 132. "To establish invasion of privacy by false light, the [plaintiff] [is] required to show that (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. . . ." (Internal quotation marks omitted.) Id., 132-33.
The defendants initially maintain that they cannot be liable for invasion of privacy by false light because they did not publicize private information about the plaintiff. The defendants are mistaken. "The form CT Page 13793 of invasion of privacy covered by the cause of action for publicity placing a person in a false light before the public does not depend upon making public any facts concerning the private life of the individual. . . ." 3 Restatement (Second), Torts § 652E, comment (a) (1971)."Handler v. Arends, Superior Court, Judicial District of Hartford-New Britain at Hartford, Docket No. 527732 (March 1, 1995, Sheldon, J.).
The defendants further argue that the information complained of by Galligan was not publicized. "The Connecticut appellate courts have not expressly defined the term `publicity' as it applies to a false light invasion of privacy claim." Pace v. Bristol Hospital, 964 F. Sup. 628, 631
(D.Conn. 1997). However, in defining and discussing the requirement of "giving publicity" in the tort of invasion of privacy by false light, Restatement (Second), Torts § 652E, comment a incorporates by reference the Restatement's comments to § 652D, pertaining to the tort of invasion of privacy by giving publicity to private facts. Restatement (Second), Torts § 652D, comment a states: "Publicity," as it is used in this Section, differs from "publication," as that term is used. . . in connection with liability for defamation. . . . "Publicity" . . . means that the matter is made public, by communication of it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication. . . . It is one of a communication that reaches, or is sure to reach, the public.
"Thus, it is not an invasion of the right of privacy, within the rule stated . . . to communicate a fact . . . to a single person or even a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or a statement made in an address to a large audience, is sufficient to give publicity. . . . The distinction, in other words, is one between private and public communication." Restatement (Second), Torts § 652D, comment a.
The defendants admit, indeed they argue, that they transmitted the U-S form containing the allegedly defamatory statement about Galligan only to the Central Registered Depository (CRD) and, in turn, to the NASD and NYSE. This can hardly be characterized as a private communication. This was a communication, if not immediately to the public at large, then "to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Indeed, the form U-5 becomes part of a data base "by which the NASD administers an employment clearinghouse. By revealing the reason for the termination the form gives other members of the association potentially valuable information concerning the availability and suitability of potential employees." Acciardo v.CT Page 13794Millennium Securities Corp., supra, 83 F. Supp.2d at 413-419 (S.D.N.Y. 2000). Therefore, the defendants "publicized" their representation that Galligan made a material misstatement.
 B.
In count four, Galligan alleges that the defendants failed to notify the NYSE that an investigation of his arrest was unnecessary after Walter learned that Galligan had successfully completed the accelerated rehabilitation program. Galligan further alleges that the falsity published by the defendants injured his reputation. In this latter respect, Galligan alleges a prima facie case of defamation. Since his claim in count four involves defamation by a writing, it is the libel species of the tort. The defendants argue that they are entitled to summary judgment on the ground that no reasonable jury could find for Galligan on his defamation claim in count four.
"Defamation is made up of the twin torts of libel and slander — the one being, in general, written while the other in general is oral. . . . Defamation is that which tends to [injure] reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." (Internal quotation marks omitted.)Lizotte v. Welker, 45 Conn. Sup. 217, 219-20, 709 A.2d 50, aff'd,244 Conn. 156, 709 A.2d 1 (1998). "In the application of this idea it is enough that the communication would tend to prejudice the plaintiff in the eyes of a substantial and respectable minority.
(Internal quotation marks omitted.)Dow v. New Haven Independent, Inc.,41 Conn. Sup. 31, 36, 549 A.2d 683 (1987). "It is not, however, necessary to the action for invasion of privacy [by false light] that the plaintiff be defamed." Restatement (Second), Torts § 652E, comment b. But "it is essential . . . that the matter be published concerning the plaintiff is not true." Id., comment a. "It is enough that [the plaintiff] is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false and so is placed before the public in a false position." Id., comment b.
Galligan's false light and defamation claims are based on the defendants reporting on the U-5 that he had made a material misstatement to Jones' compliance department. The defendants assert that this was not tortious because it was true. Specifically, the defendants claim that Galligan admitted to Walter that he had lied to Neely about the 1988 arrest being ascribable to a person who had stolen his license and used his identity. In his deposition, however, Galligan asserts (1) he only stated that the use of his identity by some other person was a CT Page 13795 possibility, and (2) he never admitted to anyone that this was untrue and does not do so now. Viewing the facts in a light most favorable to the plaintiff, a jury could reasonably find that Galligan was defamed and placed in a false light by the defendants. There is, therefore, a genuine issue of material fact precluding summary judgment on the claims of defamation and invasion of privacy by false light.
 C.
The defendants next argue that reporting on the U-S form that Galligan made a material misstatement enjoys an absolute privilege. The court disagrees. "There is a long-standing common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy. . .
The effect of an absolute privilege is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously. . . . The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements. . . ." (Citations omitted; internal quotation marks omitted.) Petyan v. Ellis, 200 Conn. 243, 245-46,510 A.2d 1337 (1986). In Petyan, the court stated: "The common law absolute privilege itself is not confined to the testimony of a witness but extends to any statement made in the course of a judicial proceeding, whether or not given under oath, so long as it is pertinent to the controversy. . . . Thus it applies to statements made in pleadings or other documents prepared in connection with a court proceeding." (Citation omitted.) Id., 251-52. The Connecticut Supreme Court has also extended the absolute privilege accorded to statements made as a requisite step to, quasi-judicial proceedings. Id., 243; Kelley v. Bonney, 221 Conn. 549,552-53, 606 A.2d 693 (1992).
The defendants argue that the statements on the U-S form should be absolutely privileged since NASD and NYSE are selfpolicing and, therefore, act in a quasi-judicial capacity. "The Securities and Exchange Commission is the federal agency charged with the regulation of the securities industry, and, because the SEC lacks the resources to police the entire industry, it relies on industry members to promote compliance with the securities laws and regulations and to pursue enforcement actions." Gold v. S.E.C., 48 F.3d 987, 990 (7th Cir. 1995). Under the Securities and Exchange Act of 1934, as amended, both the NASD and the NYSE are "self regulating organizations." 15 U.S.C. § 780-3; Baravativ. Josephthal, Lyon Ross, Inc., 28 F.3d 704, 708 (7th Cir. 1994). That is, federal securities law confers broad authority on organizations such CT Page 13796 as the NASD and NYSE to regulate the activities of their members and their employees, authority which these organizations generously, exercise. Id.; Thomas James Associates, Inc. v. Jameson, 102 F.3d 60 (2d Cir. 1996). Federal securities law also gives the NASD and NYSE quasi-judicial responsibilities for adjudicating violations of their regulations and disputes arising thereunder. Glennon v. Dean WitterReynolds, Inc., 83 F.3d 132, 137 (6th Cir. 1996); Baravati v. JosephthalLyon Ross, Inc., supra, 28 F.3d 708; Berzfeld Stern, Inc. v. Beck,175 App.Div.2d 689, 572 N.Y.S.2d 683, 685 (1991).
"When a brokerage firm terminates the employment of a broker, the firm is required to file with the NASD a Uniform Notice of Termination for Securities Industry Registration. See NASD By-laws, Art. IV, § 3 (a). In the industry, the form is commonly referred to as the `U-5' form." Andrews v. Prudential, 160 F.3d 304, 305 (6th Cir. 1998). The NYSE has the same requirement. Gold v. S.E.C., supra, 48 F.3d 988 n. 3. Although "[t]he employee can seek to clear his name by asking the NASD to investigate"; Baravati v. Josephthal, Lyon Ross, Inc., supra, 28 F.3d 708; "the submission of a Form U-5 and its transmission (upon request) to members of the NASD are not stages in the association's quasijudicial regulatory process." Acciardo v. Millennium SecuritiesCorp., supra, 83 F. Supp.2d at 413-419 (S.D.N.Y. 2000). As discussed supra, "[i]n the first instance they are the means by which the NASD administers an employment clearinghouse. By revealing the reason for the termination the form gives other members of the association potentially valuable information concerning the availability and suitability of potential employees." Id. While "[t]he U-5 form enables the NASD to detect violations and subsequently sanction persons for violations of the NASD's rules and other applicable federal statutes and regulations. See NASD Notices to Members, No. 88-67 at p. 291";Andrews v. Prudential, supra; "any item of information could do that. To insulate the members from liability for the contents of their U-5s would be tantamount to allowing a member of the NASD to blackball a former employee from employment throughout the large sector of the industry that the membership of the association constitutes." Baravativ. Josephthal, Lyon Ross Inc., supra, 28 F.3d 708.[7]
Notably, the facts in Petyan v. Ellis, supra, 200 Conn. 243, are distinguishable from those here. Petyan held that an employer's statements regarding reasons for an employee's discharge contained on a "fact-finding supplement" form provided by the employment security division of the state labor department was protected by the absolute privilege reserved for witnesses. In Petyan, however, the plaintiff had filed a claim for unemployment compensation benefits. The court held that "[t]he employment security division . . . acts in a quasi-judicial capacity when it acts upon claims for unemployment compensation." Id., CT Page 13797 249. The statements on the form submitted by the employer were submitted in lieu of live testimony. Indeed, the form stated: "If you are unable to attend the scheduled hearing, please enter all pertinent information regarding your reason the above named claimant separated from you employ. . . ." Id., 245. Here, by contrast, there were no pending or impending quasijudicial proceedings.
Since the filing of a U-S is not preliminary to a quasijudicial proceeding nor to the receipt of government benefits, such as unemployment compensation, this court holds that an absolute privilege does not attach to statements in it. See Flanagan v. McLane, 87 Conn. 220, 88 A. 96
(1913) (letter to police accusing plaintiff of larceny entitled to qualified privilege only).
Statements in a U-5 filing, however, are entitled to a qualified privilege. "A qualified or conditional privilege arises out of an occasion, such as, when one acts in the bona fide discharge of a public or private duty. Flanagan v. McLane, [supra, 87 Conn. at 221-22]." Miles v.Perry, 11 Conn. App. 584, 594, 529 A.2d 199 (1987). "[S]ince [NASD] members are required to state the reason for termination on the U-5, denial of the privilege puts them in a hard place, where if they state a reason discreditable to the employee they may be sued for libel while if they lie about the reason they will be violating the association's rules." (Emphasis in original) Baravati v. Josephthal, Lyon Ross,Inc., supra, 28 F.3d 708. As have most courts that have considered the issue; Acciardo v. Millenium Securities Corp., supra,83 F. Supp.2d at 419
and n. 8 (cases collected); contra, Herzfeld Stern, Inc. v. Beck,175 App.Div.2d 689, 572 N.Y.S.2d 683 (1991), appeal dismissed,79 N.Y.2d 914, 581 N.Y.S.2d 666, 590 N.E.2d 251 (1992); this court holds that statements in a Form U-5 enjoy a qualified privilege. AccordHeldmann v. Tate, Superior Court, judicial district of Tolland at Rockville, No. 59122 (May 20, 1999). (24 Conn.L.Rptr. 552) The essential elements of a qualified or conditional privilege are "(1) an interest to be upheld, (2) a statement limited in its scope to this purpose, (3) good faith, (4) a proper occasion, and (5) a publication in a proper manner to proper parties only. . . N[o] conditional privilege exists where the defamatory remarks are activated by malice, improper motive, or lack of good faith in making the statement. See id." Miles v. Perry,11 Conn. App. 584, 595, 529 A.2d 199 (1987).
 D.
The court now addresses whether, as a matter of law, the defendants have proven they did not abuse and lose the qualified privilege. Gaudiov. Griffin Health Services Corp., supra, 249 Conn. at 556. The defendants satisfy the first and fourth requirements of this rule because they were CT Page 13798 required by NASD rules to file a U-5 when they discharged the plaintiff and did so soon after that discharge. The allegedly defamatory remark also was limited in its scope to a narrow statement of the purported reason for the plaintiff's discharge, thus satisfying the second requirement. As for the fifth requirement, there appears nothing unusual about the publication of the U-5 to the NASD and NYSE. Moreover, there is no claim that these associations were not apprised of the contents of U-5 filings as of course. Herzfeld Stern, Inc. v. Beck, supra, 572 N.Y.S.2d 684; Gold v. S.E.C., supra, n. 3 (7th Cir. 1995).
This leaves the central requirement of qualified immunity: whether the defendants acted in good faith. Good faith, in this context, is substantially equivalent to an absence of malice — malice being actual knowledge of the defamatory statement's falsity or reckless disregard as to its truth, or any improper motive. Gaudio v. GriffinHealth Services Corporation, 249 Conn. 523, 545, 733 A.2d 197 (1999);Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1,29-30, 662 A.2d 89 (1995).
The court cannot find as a matter of law that the defendants acted without malice. The defendants posit that Galligan was discharged not for what he wrote or did not write on his U-4, but because he fabricated to Neely a story that the arrest revealed by the FBI check was of another person who had stolen his wallet in 1988. However, taking Galligan's sworn deposition testimony in a light most favorable to him, he was discharged because he refused to alter his U-4 disclosures in a manner that the defendants knew would have been inaccurate or as to which they recklessly disregarded the truth. There remains this over-arching issue of material fact that precludes summary judgment. While the plaintiff's scenario may not appear to be a likely one to the court, the law of Connecticut is that "a party has the same right to submit a weak case [to a jury] as he has to submit a strong one." Strickland v. Vescovi, 3 Conn. App. 10, 16,484 A.2d 460 (1984) (reversing the granting of summary judgment).
 IV
In count five of his amended complaint, Galligan alleges that the defendants' conduct negligently inflicted emotional distress on him. The defendants move for summary judgment on count five on the ground that no reasonable jury could find for Galligan on this cause of action. Specifically, Jones and Walter argue that their actions in the termination process did not pose an unreasonable risk of causing emotional harm.
Connecticut has recognized the tort of negligent infliction of emotional distress, without requiring an accompanying physical injury, since 1978. Montinieri v. Southern New England Telephone Co., CT Page 13799175 Conn. 337, 345, 398 A.2d 1180 (1978). In order to prevail on such a claim, however, the plaintiff has the burden of proving that the defendants (1) committed a tortious act that caused the plaintiff emotional distress, (2) should have realized that their conduct involved an unreasonable risk of causing emotional distress and that (3) distress, if it were caused, might result in illness or bodily harm. Parsonsv. United Technologies Corp., 243 Conn. 66, 88, 700 A.2d 655
(1997); Morris v. Hartford Courant Co., 200 Conn. 676, 683-84,513 A.2d 66 (1986); Montinieri, supra; Anconav. Manafort Bros., Inc., 56 Conn. App. 791, 713, 746 A.2d 1842, cert. denied, 252 Conn. 954, ___ A.2d ___ (2000); Pavliscak v. BridgeportHospital, 48 Conn. App. 580, 597, 711 A.2d 747, cert. denied,245 Conn. 911, 718 A.2d 17 (1998); Restatement (Second), Torts § 313 (1965).
The defendants rely on the rule that "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process. . . . The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." (Citations omitted; internal quotation marks omitted.) Parsons v. United Technologies Corporation, supra, 243 Conn. at 88-89.
Here, there is more than the mere wrongful termination of an employee. Crediting Galligan's version of events, the defendants followed their termination of Galligan with the filing of a form U-S that was not only false but accused Galligan of dishonesty. Galligan has presented evidence that the practical effect of this filing was to prevent him to this day of obtaining work in his chosen profession. A jury could reasonably find that such conduct "involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." Parsons v. United Technologies Corp., supra, 243 Conn. at 88.
The motion for summary judgment is granted as to count two. Given the differing version of certain critical events posited under oath by the parties, the motion must be, and it is, denied as to the remaining counts.
BY THE COURT
 Bruce L. Levin Judge of the Superior Court