[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT
This is an action against, an attorney, Paul M. Gaide, and his law firm, Gaide Associates, LLC (hereafter "the Firm"), by or on behalf of five individuals, Matthew Flanagan, Jeremy Flanagan, Carrie Flanagan, Courtney Flanagan, and Lisa Flanagan. Lisa Flanagan is the mother of the other plaintiffs. The action arises out of Attorney Gaide having issued and had served one post-judgment interrogatory on each of the children in November, 1998. The interrogatory related to an action in the United States District Court for the District of Connecticut (Covello, J.) in which Attorney Gaide had obtained a judgment on behalf a client, the Cadle Company against Charles Flanagan, the father of Matthew, Jeremy, Carrie, and Courtney.
The complaint alleges two causes of action against the defendants Gaide and the Firm. The First Count alleges abuse of process. The Second Count alleges intentional infliction of emotional distress. Each cause of action has as its sole factual foundation the post-judgment interrogatory served by abode service on Matthew, Jeremy, Carrie, and Courtney.
The defendants have moved for summary judgment on the grounds that there are no material issues of fact and that these defendants are entitled to judgment in their favor.
Facts submitted by defendants
CT Page 10389
In support of their Motion for Summary Judgment the defendants have provided the affidavit of Attorney Gaide and 37 exhibits attached to it (hereafter "Gaide Affidavit"). The plaintiffs have filed a Motion to Exclude the Affidavit of Attorney Gaide on the basis of Mental Capacity. This Motion was not timely filed because it had not been filed at the time of the oral argument on the Motion for Summary Judgment. However, the court has reviewed the Motion and finds that it is without merit. The plaintiffs claim that because Attorney Gaide has alleged in a lawsuit against them that their actions have caused him to suffer certain mental and emotional distress. The plaintiffs allege that those allegations render Attorney Gaide incapable of signing the affidavit in support of the Motion for Summary Judgment.
Section 6.3 of the Code of Evidence provides:
 (a) Incapable of understanding the duty to tell the truth.
A person may not testify if the court finds the person incapable of understanding the duty to tell the truth, or if the person refuses to testify truthfully.
 (b) Incapable of sensing, remembering or expressing oneself.
A person may not testify if the court finds the person incapable of receiving correct sensory impressions, or of remembering such impressions, or of expressing himself or herself concerning the matter so as to be understood by the trier of fact either directly or through interpretation by one who can understand the person. The substance of the affidavit and supporting documents, which include court pleadings, transcripts and other admissible evidence, is summarized below.
The plaintiffs have presented no evidence that Attorney Gaide fails to meet the requirements of Section 6.3 of the Code of Evidence. The affidavit submitted by Attorney Gaide is supported by numerous appended exhibits. Moreover, most of the facts in the affidavit, such as the date of the judgment, the amount of the judgment, the date of the post judgment interrogatories, the fact that Flanagan was held in contempt by Judge Covello and the payment by Flanagan of the judgment are not contested by the plaintiffs. They contest only the reasonableness of Attorney Gaide's belief that the plaintiff children might have assets of Flanagan. As more fully set forth below, the belief appears to be reasonable, rational and supported by other competent evidence. There is nothing to lead the court to believe that Attorney Gaide was anything other than rational when he authored the affidavit and the court declines to exclude it. CT Page 10390
Attorney Gaide's Affidavit in Support of Summary Judgment contains evidence of the following facts. On December 31, 1996 Gaide filed an action on behalf of The Cadle Company against Charles A. Flanagan in the United States District Court for the District of Connecticut, known asThe Cadle Company v. Charles A. Flanagan, Case No.: 3-96-CV-02648 (AVC) (hereafter referred to as "the action"), pursuant to which The Cadle Company sought to recover a money judgment against Charles A. Flanagan on a $75,000.00 Promissory Note made by Flanagan. On or about February 27, 1997, Flanagan, through his counsel, Attorney Leonard A. Fasano, filed a joint Motion for Judgment dated February 11, 1997 with the United States District Court, together with a fully executed Stipulation to Judgment against Charles A: Flanagan in the amount of $90,747.87.
By order dated March 20, 1997, the Court, Covello, J., granted the Motion for Judgment and thereafter entered a judgment in the action in favor of The Cadle Company and against Charles A. Flanagan in the amount of $90,747.87 (hereinafter referred to as "the judgment"). On October 2, 1997, Gaide directed an associate of the Firm to file a Writ of Execution (Application) in the action. On October 7, 1997 the District Court endorsed the Writ of Execution. Thereafter the execution was sent to Deputy Sheriff Timothy S. Wall for service.
On January 5, 1998 Deputy Sheriff Wall attested to making service of the Writ of Execution on Thompson Peck, Inc., by in-hand service on its President, Stanley F. Prymas. On January 22, 11998, Flanagan acknowledged that the execution had been served on him by sending Gaide an Exemption Claim Form — Property Execution dated January 20, 1998. In the exemption claim, Flanagan claimed that "The only property held by Thompson Peck is wages and, therefore, not subject to a property execution. The wages are already attached."
In an Objection to Property Execution dated January 20, 1998, Flanagan represented that Thompson Peck, Inc. held no property of the judgment debtor, Charles A. Flanagan. Unable to satisfy the judgment with the Property Execution, Attorney Gaide on February 11, 1998 filed a Petition for Examination of Judgment Debtor pursuant to which he sought to conduct a court ordered examination of the judgment debtor, Flanagan.
On February 11, 1998, the court granted the Petition for Examination of Judgment Debtor and set an examination date of March 9, 1998. Thereafter the Court's Order for examination and a subpoena duces tecum and request for production was served by Deputy Sheriff Wall on Charles Flanagan.
Flanagan objected to the request for production, which was a part of the examination service, to the limited extent that Flanagan did not want CT Page 10391 to be compelled to produce a certain settlement agreement between himself, Mr. Prymas and Thompson Peck, Inc. In light of that Objection, Attorney Gaide filed a Motion to Compel in order to attempt to obtain all documents which were the subject of the examination service, including, without limitation, the settlement agreement. The Motion to Compel was granted by the court on April 13, 1998.
On March 9, 1998, prior to the examination of judgment debtor, Attorney Gaide, Flanagan and his attorney, Robert Skelton, appeared before Judge Covello. At the hearing Attorney Skelton informed the court that: (i) Flanagan was the subject of a criminal investigation and intended to invoke his rights not to testify under the Fifth Amendment to the United States Constitution; (ii) he had "instructed his client except for his address, marital status, his age and any other such question, that he will not answer any question regarding his assets or any means to repay the judgment"; and (iii) the documents which were the subject of my client's request for production were also claimed to be privileged under the Fifth Amendment claim.
In response to Flanagan's Fifth Amendment claim, Judge Covello, from the bench, entered the following injunction: "I am entering an order that Mr. Flanagan, from this point forward, transfer nothing of a single asset until such time as this is unraveled, and that includes the family lawn mower, bicycle, whatever." In addition, he directed that the settlement agreement and all documents which were the subject of the request for production as to which Flanagan was invoking his Fifth Amendment privilege be transferred to the court for in camera inspection and ordered Flanagan to submit a budget of expenses to the court.
Thereafter, on March 9, 1998, the examination of judgment debtor was commenced. Flanagan, with the assistance of his attorney, Robert Skelton, asserted his Fifth Amendment privilege to all material questions posed to him and indicated that he would not answer any material question.
The transcript of the examination provides, in part:
 Question(by Attorney Gaide) Mr. Flanagan, where do you reside?
A 230 Mill Brook Road, North Haven
Q And who owns 230 Mill Brook Road, North Haven?
A I assert my privilege under the Fifth Amendment. I will not answer the question. CT Page 10392
Q Do you claim an ownership interest in 230 Mill Brook Road?
A No, I don't.
Mr. Skelton: I am going to instruct my client, for the record, from now on, with respect to any assets and any means to repay, to assert his privilege under the Fifth Amendment.
Bt Mr. Gaide:
Q Mr. Flanagan, do you have a lease with respect to your occupancy of the property at 230 Mill Brook Road?
Mr. Skelton: Assert your privilege.
Mr. Flanagan: I assert my privilege under the Fifth Amendment.
Mr. Gaide; And what is the basis under the Fifth Amendment to —
Mr. Skelton: My client is currently under investigation by the IRS. The IRS is investigating all assets my client has had over the last five, six, seven ears. We are not answering any question until that investigation is closed.
 . . . . .
Q Is there a civil action or criminal action pending against you by the United States of America?
Mr. Skelton: Assert your privilege
Mr. Flanagan: I assert my privilege under the Fifth Amendment.
Mr. Gaide: You have to identify what action you're asserting your privilege under, sir.
Mr. Skelton: Are you done?
Mr. Gaide: Yes.
Mr. Skelton: Okay. Assert your privilege.
 . . . . .
Mr. Gaide: I'm asking about the investigation so that I can confirm the CT Page 10393 investigation.
Mr. Skelton: I've told you what the investigation is.
On March 13, 1998 Attorney Gaide filed a Motion for Turnover in the District Court. The court granted the Motion for Turnover on April 13, 1998. Pursuant to the Turnover Order, Charles A. Flanagan and Thompson 
Peck, Inc. were ordered to:
 immediately turn over all evidence of Charles A. Flanagan's ownership and/or other interest in Thompson Peck, Inc. and its related entities, including any and all stock certificates in his/its possession, under his/its control and/or available to him/it or in which he had an interest as of the date the Property Execution in this matter was served . . . [and]
 provide to the Plaintiff a full and complete accounting as to any disposition of such evidence if a claim is asserted by either Charles A. Flanagan and/or Thompson Peck, Inc. that Charles A. Flanagan sold, hypothecated, pledged, gifted or otherwise divested himself or disposed of any interest in the referenced entity(ies). . . .
On May 8, 1998, Flanagan filed a Motion for Reconsideration dated April 22, 1998, seeking reconsideration of the April 13, 1998 Turnover Order and the April 13, 1998 Order to Compel. The motion represented that documents were being gathered to be submitted to the court for in camera
review, that a privilege log was being prepared, and that "[r]econsideration is proper in this case because Charles Flanagan has been enjoined from transferring any assets. . . ."
On September 23, 1998, the United States District Court (Covello, J.) granted Flanagan's Motion for Reconsideration, but denied the relief that he had requested. The Order gave full effect to the court's April 13, 1998 Turnover Order; i.e., Flanagan was required to comply with the Turnover Order. In addition, the court ordered Flanagan to produce to Attorney Gaide certain of the documents that had been provided to the court for in camera review. On October 2, 1998, Flanagan filed a Motion for Stay dated October 1, 1998, pursuant to which he sought to stay compliance with the Turnover Order and the Order compelling the production of documents for thirty (30) days so as to provide him with the opportunity to consider an appeal to the Second Circuit Court of Appeals with respect to the Turnover Order and Order to Compel. The court denied the Motion for Stay. CT Page 10394
Rather than complying with the Turnover Order and the Order to Compel, on October 13, 1998, Flanagan filed three documents: (i) an Additional Motion to Stay Enforcement of Judgment; (ii) a Motion to Vacate All Orders of the Court); and (iii) a Motion to the Court to Intervene. These sought to stay the enforcement of the judgment, to impose a payment plan, and to obtain an order vacating the March 9, 1998 injunction, the Turnover Order and the order to produce documents. In his moving papers Flanagan suggested that the obligation and payment plan be secured by the posting of a bond. Attorney Gaide inferred that Flanagan had sufficient assets to satisfy the judgment because he offered to post a bond and Attorney Gaide did not believe that Flanagan would be able to get a bond without adequate collateral.
Thereafter, Flanagan served and filed a document entitled "Notice of Compliance" dated October 21, 1998, by which Flanagan purported to comply with the Turnover Order by "stating that the stock is in possession of a creditor, Sharon Demetropolous, and the defendant, Charles A. Flanagan, does not have possession or control of said stock." The response did not comply with that part of the Turnover Order which required Flanagan to:
 provide to the Plaintiff a full and complete accounting as to any disposition of such evidence if a claim is asserted by either Charles A. Flanagan and/or Thompson Peck, Inc. that Charles A. Flanagan sold, hypothecated, pledged, gifted or otherwise divested himself or disposed of any interest in the referenced entity(ies). . . .
On October 22, 1998, Flanagan served and filed a document entitled "Amended Notice of Compliance" as another purported compliance with the Turnover Order. This document provided additional information as to the address of Ms. Demetropolous and represented that she had held the stock since prior to the entry of the injunction, March 9, 1998, but did not otherwise comply with the Turnover Order.
On October 22, 1998, the United States District Court (Covello, J.), sua sponte, entered a Show Cause Contempt Order in the action, which reads, in part:
 The defendant, Charles A. Flanagan, is ordered to show cause, if any there be, on November 16, 1998 . . . why a finding of contempt should not enter against the defendant and/or his counsel, for failing to comply with this court's April 13, 1998 turnover order. . . .
At that time, the defendant is further ordered to show cause, if any there be, why the court should not issue sanctions CT Page 10395 pursuant to Rule 11 of the Federal Rules of Civil Procedure and/or pursuant to 28 U.S.C. § 1927. . . .
As of the beginning of November, 1998, it appeared to Attorney Gaide that Flanagan was using every means of which he and his attorneys could conceive to, inter alia: (i) forestall the payment of the judgment; (ii) avoid providing documentation that might lead to the location of assets for execution; (iii) conceal and/or withhold the Thompson Peck, Inc. stock; (iv) withhold trust documentation pertaining to a Charles A. Flanagan Family Trust; (v) withhold information concerning the ownership of Flanagan's residence at 230 Millbrook Road, North Haven, Connecticut; and (vi) avoid divulging where significant income from rental properties was being placed.
At the beginning of November, 1998, the status was such that it appeared to Attorney Gaide that the Turnover Order was not going to produce an asset from which he could collect the judgment in favor of his client. Therefore, Attorney Gaide looked to third parties who might have assets upon which we could execute. He identified a number of individuals and entities who seemed to have reasonable potential to be holders of assets of Flanagan, among them, his children. Thereafter Attorney Gaide commenced third party asset discovery in the manner prescribed by the applicable statutes and rules.
As of November, 1998, post-judgment discovery upon third parties in the United States District Court was that allowed by the state in which the court was located. At that time the method of discovery of assets of a judgment debtor by a judgment creditor in Connecticut was controlled by Connecticut General Statutes Section 52-351b and by Connecticut Practice Book Section 13-20 (formerly Section 236A). Section 13-20 provides that discovery is allowed from "any third party the judgment creditor reasonably believes, in good faith, may have assets of the judgment debtor . . . of any matters relevant to satisfaction of the money judgment." Connecticut General Statutes Section 52-351b is the same, using nearly identical language. The procedure required by Practice Book Section 13-20 was:
 The judgment creditor shall commence any discovery proceeding by serving interrogatories on a form approved by the judges of the superior court, or their designees, on the person from whom discovery is sought.
On November 9, 1998 AttorneyGaide provided Post Judgment Interrogatories (hereinafter, "PJIs") directed to Flanagan's children, Matthew Flanagan, Jeremy Flanagan, Carrie Flanagan and Courtney Flanagan (collectively hereinafter referred to as the "Flanagan Children") to CT Page 10396 Deputy Sheriff Benjamin Mazzucco for service. Attorney Gaide gave the requisite notice to Flanagan that service of the PJIs upon the Flanagan Children would be made. According to his return, service of the PJIs upon the Flanagan Children was made by then Deputy Sheriff Mazzucco by abode service at 230 Millbrook Road, North Haven, Connecticut on November 12, 1998.
On November 12, 1998, four days before the Show Cause Hearing, Flanagan filed a Second Amended Notice of Compliance claiming that Flanagan's stock interest in Thompson Peck, Inc. was not in the possession of Ms. Demetropolous, but was in the possession of Socrates Babacus of Springfield, Massachusetts, allegedly as collateral for a $120,000.00 loan made on or about June 19, 1997. The Second Amended Notice of Compliance once again failed to comply with the requirements of the Turnover Order, and confirmed Attorney Gaide's belief that Flanagan was engaging in a concerted attempt to hide assets.
The form PJIs contained check-off boxes which directed the Flanagan Children to answer only one substantive question, "Are you in possession of non-exempt personal property belonging to the judgment debtor? No Yes", and to provide supplemental information if the answer was "yes". The plaintiffs never returned the answered PJIs to Attorney Gaide.
On November 16, 1998, the United States District Court (Covello, J.), held an evidentiary hearing pursuant to the Show Cause Order issued on October 22, 1998. This hearing was scheduled long before the PJIs wereserved on the plaintiffs. Upon the evidence, the court found Charles A.
Flanagan in contempt of court and ordered him immediately confined to the federal Bureau of Prisons:
 Without commenting with respect to any credibility issues that are raised or were raised by the testimony today, the Court concludes that it has been established here that . . . the defendant has willfully and intentionally not complied with the order as previously entered by the Court, and orders him committed to the Bureau of Prisons until such time as he purges himself of the contempt by complying fully with the order.
Thereafter, upon the representation that Flanagan, his attorneys and others would comply with the Turnover Order by producing documentation to justify the claimed loan from and pledge of stock to Mr. Babacus, the court stayed the execution of the incarceration portion of the contempt order and continued the hearing for eight (8) days, to November 24, 1998, 50 as to allow Flanagan the opportunity to purge himself of the CT Page 10397 contempt. Flanagan never did comply with the Turnover Order or produce the requisite disclosures and production. Rather, on or about November 20, 1998, Flanagan tendered funds in the amount of $99,542.87 to the registry of the United States District Court to satisfy the judgment, and thereafter sought the vacation of the March 9, 1998 injunction, the contempt order, the Turnover Order, and the production order. The Cadle Company was paid the judgment amount, with accrued interest, as a result of the court's December 3, 1998 Order granting its Motion for Payment of Monies Deposited Into Court. As a result of the deposit of funds and later payment to The Cadle Company, the PJIs became moot.
Facts submitted by the plaintiffs
In opposition to summary judgment the plaintiffs have filed the affidavit of Lisa Flanagan. That affidavit consists of 10 paragraphs. Mrs. Flanagan does not dispute anything in Attorney Gaide's affidavit, except his reasonable belief that Flanagan's children might he holding some of his assets. The affidavit provides in pertinent part:
 5. Despite statements to the contrary, upon information and belief, Attorney Gaide, at the direction of the other Defendants, directed that the Sheriff harass my children. The service was made after dark (sometime between 4 and 6:00 p.m.) And the Sheriff proceeded to bang and pound loudly on the doors and windows shouting, "You open this door, we know you're in there!" I received a frantic call from my son Matthew describing to me what was going on. I directed him to keep all the lights on and call the police. . . . .
 7. Upon information and belief, Attorney Gaide instructed the Sheriff to assault our children emotionally and he succeeded in doing so and now has to pay that price.
The foregoing paragraphs would not be admissible in evidence. Mrs. Flanagan admittedly was not present when the sheriff served the post judgment interrogatories, so her affidavit as to the manner of service is based on hearsay. More importantly, she offers no evidence whatsoever to support her claim that Attorney Gaide instructed the Sheriff to "assault [her] children emotionally." Attorney Gaide has produced a copy of his letter to the sheriff which contains no such instruction.
The plaintiffs have also failed to provide any reason why Flanagan, who had advance knowledge that the interrogatories would be served, had simply not phoned his house to tell his children to accept service, thus avoiding any alarm they may have experienced, or why Flanagan had not simply offered to accept service on behalf of his children, which would CT Page 10398 also have avoided alarming the children.
The only other evidence offered by the plaintiffs in opposition to summary judgment is an affidavit by Attorney Skelton which references and attempts to introduce as "evidence" a Memorandum of Law filed on behalf of Flanagan in a grievance filed against Attorney Gaide. The Memorandum of Law constitutes hearsay and would clearly not be admissible into evidence by the plaintiffs.
Discussion of the Law and Ruling
Practice Book § 17-49 (formerly § 384) provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Connecticut Bank Trust Co. v. Carriage Lane Associates,219 Conn. 772, 780-81, 595 A.2d 334 (1991); Lees v. Middlesex Ins. Co.,219 Conn. 644, 650, 594 A.2d 952 (1991). Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact; D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434,429 A.2d 908 (1980); a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact, together with the evidence disclosing the existence of such an issue. Practice Book §§ 17-45, 17-46; Burns v. Hartford Hospital,192 Conn. 451, 455, 472 A.2d 1257 (1984). In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. Town Bank Trust Co. v. Benson,176 Conn. 304, 309, 407 A.2d 971 (1978); Strada v. ConnecticutNewspapers, Inc., 193 Conn. 313, 317, 477 A.2d 1005 (1984). The test is whether a party would be entitled to a directed verdict on the same facts. Batick v. Seymour, 186 Conn. 632, 647, 443 A.2d 471 (1982); NewMilford Savings Bank v. Roina, 38 Conn. App. 240, 243-44, 659 A.2d 1226
(1995).
Summary judgment should only be granted if the pleadings, affidavits and other proof submitted demonstrate that there is no genuine issue as to any material fact. Scinto v. Stain, 224 Conn. 524, 530, cert. denied,114 S.Ct. 176, 126 L.Ed.2d 136 (1993); Connell v. Colwell, 214 Conn. 242,246, 571 A.2d 116 (1991). Summary judgment is "designed to eliminate the delay and expense of litigating an issue where there is no real issue to be tried." Wilson v. City of New Haven, 213 Conn. 277, 279, 567 A.2d 829
(1989)
Mere assertions of fact are insufficient to establish the existence of an issue of material fact and cannot refute evidence that is properly presented to a court in support of a motion for summary judgment. MillerCT Page 10399v. United Technologies Corp., 233 Conn. 732 (1995). Evidence in support of motions for summary judgment and opposition to such motions must be admissible evidence. Evidence that is inadmissible cannot be relied upon for purposes of a motion for summary judgment. Fogarty v. Rashaw,193 Conn. 442, 444, 476 A.2d 582 (1984); see, Practice Book Sections 17-45, 17-46. If the non-moving party fails to respond with specific facts, the court is entitled to rely upon the facts stated in the affidavit of the movant. Id. If such affidavit, pleading or other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, the motion for summary judgment should be granted. Practice Book Section 17-49.
The defendants are entitled to summary judgment as to the First Count because the post-judgment interrogatories served on Matthew Flanagan, Jeremy Flanagan, Carrie Flanagan and Courtney Flanagan were used in the proper manner and for their intended purpose.
 An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed.
 Honan v. Dimyan, 52 Conn. App. 123, 130, 726 A.2d 613 (1999) citingVarga v. Pareles, 137 Conn. 663, 667, 81 A.2d 112 (1951) (emphasis added). Since the tort arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, the Restatement (Second) of Torts emphasizes that the gravamen of the action for abuse of process is the use of a legal process against another primarily to accomplish a purpose for which it is not designed. Honan,52 Conn. App. at 130.
Comment b to Section 682 of the Restatement (Second) of Torts states that the addition of "primarily" is meant to exclude liability when the process is used for the purpose for which it is intended, even if there is an incidental motive of spite or an ulterior purpose or benefit to the defendant. Id.; Norse Systems, Inc. v. Tingley Systems, Inc.,49 Conn. App. 582, 715 A.2d 807 (1998). Therefore, a party is not said to have abused legal process merely by filing a lawsuit. Norse Systems,Inc., 49 Conn. App. at 601. Rather, the plaintiff must "point to specific misconduct intended to cause specific injury outside of the normal contemplation of private litigation." Id. at 602. In this case the plaintiffs have pointed to no improper motive whatsoever on the part of Attorney Gaide.
As of November, 1998, the United States District Court rules provided, in pertinent part:
CT Page 10400 In aid of the judgment or execution, the judgment creditor . . ., may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held.
Rule 69, Federal Rules of Civil Procedure.
Post-judgment discovery of assets of a judgment debtor by a judgment creditor was provided for in Connecticut, the state in which the subject United States District Court was held, by Connecticut General Statutes Section 52-351b and by Connecticut Practice Book Section 13-20 (formerly Section 236A). Connecticut General Statutes Section 52-351b provided, as pertinent:
 A judgment creditor may obtain discovery from the judgment debtor, or from any third person he reasonably believes, in good faith, may have assets of the judgment debtor . . . of any matters relevant to satisfaction of the money judgment
Practice Book Section 13-20 contains the same authority in nearly identical language.
 A judgment creditor may obtain discovery from the judgment debtor, or from any third person the judgment creditor reasonably believes, in good faith, may have assets of the judgment debtor . . ., of any matters relevant to satisfaction of the money judgment.
The procedure required by Section 52-351b is stated:
 The judgment creditor shall commence any discovery proceeding by serving an initial set of interrogatories, in a prescribed form containing such questions as to the assets and employment of such judgment debtor as may be approved by the judges of the superior court or their designees, on the person from whom discovery is sought.
The language of Practice Book 13-20 is substantively identical:
 The judgment creditor shall commence any discovery proceeding by serving interrogatories on a form approved by the judges of the superior court, or their designees, on the person from whom discovery is sought.
Pursuant to Section 52-351b, the person upon whom service of the CT Page 10401 interrogatories has been made must answer the interrogatories and return them to the judgment creditor within thirty days from the date of service. Subsection (d) of Section 52-351b provides that any party from whom discovery is sought may seek a protective order pursuant to Section52-400a. The notice on the post-judgment interrogatories served on the Flanagan children expressly provides that "any party from whom discovery is sought may apply to the court for protection from annoyance, embarrassment, oppression or undue burden or expense". No protective order was sought in this case.
The manner of service of post judgment remedies interrogatories is prescribed by Connecticut General Statutes § 52-350e:
 (a) Unless otherwise provided by section 52-351a, 52-351b, 52-356a, 52-356b or 52-361a, service of process concerning a postjudgment procedure . . . may be made (1) by a proper officer sending a true and attested copy thereof by certified mail, return receipt requested, to a person at his last-known address, or (2) as provided for service of process by chapter 896, or (3) as provided by rule of court for service on an appearing party if made on a party who has filed a postjudgment appearance or if made within one hundred eighty days of rendition of judgment on a party who has appeared in the action.
Connecticut General Statutes provides, at § 52-57, that:
 (a) Except as otherwise provided, process in any civil action shall be served by leaving a true and attested copy of it, including the declaration or complaint, with the defendant, or at his usual place of abode, in this state.
Much of the plaintiffs' opposition to summary judgment is based on their claim that the abode service in this case violated a public policy which affords children special deference in the service of process. This state has no such public policy.
With respect to minors, General Statutes § 52-57 has been interpreted by the Connecticut Appellate Court, as follows:
In a civil action, General Statutes § 52-57 requires service on an individual "by leaving a true and attested copy of it, including the declaration or complaint, with the defendant, or at his usual place of abode, in this state." (Emphasis added.) There is no requirement, whatsoever, that service be on the parent or guardian of a defendant who is a CT Page 10402 minor. The, service is made in the usual way as though the defendant were of majority. E. Stephenson, Connecticut Civil Procedure (2d Ed. 1970) § 26(j). Thus, there is no requirement for service on a parent or guardian in Connecticut when the defendant is a minor.
Tax Collector of City of New Haven v. Miley, 34 Conn. App. 634, 641,642 A.2d 747 (1994); see also, Larosa v. Lupon, 44 Conn. App. 225,688 A.2d 356 (1997), cert denied, 240 Conn. 918, 692 A.2d 813 (1997). InLarosa, the minor defendant took the position that he should be afforded special protection with respect to service of process due to his status as a minor.
 The defendant does not dispute that Miley is dispositive but asserts that Miley should be overruled as being inconsistent with the public policy of our state, which dictates that the welfare of minors should be protected in court matters. The defendant argues that, for example, a minor should not be the object of direct service of process by a sheriff but that such service should be effected by service on a parent or next friend. The defendant argues that the same reasons that require a minor to bring an action through a parent or next friend should require that an action be brought against a minor only through a parent or next friend.
Id. at 227. The Connecticut Appellate Court flatly rejected the argument:
 Our decision in Miley, which is controlling, is consistent with the statutory law of our state governing service of process as provided by General Statutes 52-57. (Footnote omitted) We regard that statute as embodying the public policy of our state pertaining to service on minors.
Id. at 227-228. The same analysis clearly would apply to process such as the subject interrogatories.
The post-judgment interrogatories in the present matter were issued by Gaide, as attorney for The Cadle Company, a plaintiff in a civil action in the United States District Court in which The Cadle Company was a judgment creditor. This fact is undisputed. It also is indisputed that the judgment had not been satisfied as of November 9, 1998 when the post-judgment interrogatories were issued or on November 12, 1998 when they were served. It is equally indisputed that as of those dates the judgment debtor, Charles Flanagan, father of Matthew, Jeremy, Carrie and Courtney had succeeded in avoiding, not only execution on any of his assets, but disclosure of any such assets, turnover of one known asset CT Page 10403 (the Thompson Peck, Inc. stock), and disclosure of any information concerning suspected assets from which Attorney Gaide, on behalf of his client, could seek to execute, or from which he could conclude that there were no assets on which to execute. Such nondisclosure was sufficiently egregious to provoke the district court sua sponte to order a Show Cause Contempt Hearing. The foregoing facts demonstrate that Attorney Gaide made significant efforts to locate Flanagan's assets for a period of twenty months after obtaining judgment before serving the post judgment interrogatories on the Flanagan children.
The plaintiffs argue that before a judgment creditor can serve post judgment interrogatories on third parties, he must have probable cause to believe that the third parties have assets of the debtor. The plaintiffs provide no authority for this argument. Such a requirement would eviscerate the utility of post judgment interrogatories. If a creditor had probable cause to believe a third party held assets of the debtor, he would not need to file a post judgment interrogatory to determine the amount and nature of the assets, but could merely execute on the assets.
Under Practice Book § 13-20 the judgment creditor merely requires a good faith belief that the third party may have property of the debtor. It is certainly not uncommon for people to evade creditors by putting assets in the name of their children. Thus, without any more information than the parent-child relationship, it is reasonable for a creditor and his attorney to seek information about whether a debtor's children may hold a debtor's assets. Where a debtor has gone to extraordinary lengths to avoid the payment of a debt as Flanagan did in this case, it was clearly reasonable for Attorney Gaide to believe that the children might have assets of the debtor, their father. As a matter of fact, Flanagan testified before the Grievance Panel on April 6, 2001 that he had put certain funds into accounts in his children's names. The fact that two of the plaintiff children had assets of Flanagan demonstrates the reasonableness of Attorney Gaide's belief.
The gravamen of the opposition to the Motion for Summary Judgment by the plaintiffs addressess the manner in which the interrogatories were served. The Affidavit of Lisa Flanagan contains a hearsay statement that the sheriff banged on the door and frightened the children. However, there is absolutely no evidence presented by the plaintiffs that Attorney Gaide instructed the sheriff to serve the interrogatories in any particular manner.
The only other argument advanced by the plaintiffs in opposition to summary judgment pertains to the alleged finding by a local grievance panel that there was probable cause to believe that Attorney Gaide violated Rule 4.2 and Rule 4.4 of the Rules of Professional Conduct when CT Page 10404 he served the post-judgment interrogatories at issue here. However, this court's consideration of such finding is completely improper. Any finding by a grievance panel would be inadmissible in the trial of this action. Moreover, a violation of the Rules of Professional Conduct does not create civil liability.
The "Scope" portion of the Rules provides:
 Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty was breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulatory conduct through disciplinary agencies. They are not designed to be a basis for civil liability. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extradisciplinary consequences of violating such a duty.
Rules of Professional Conduct, Scope (1986). This concept has been acknowledged by the Courts:
 Even if Braunstein's actions did constitute such a breach, that would not create an issue of material fact that would preclude the granting of a motion for summary judgment. "Violation of a Rule [of the Rules of Professional Conduct] should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability." (Internal quotation marks omitted.) Mozzochi v. Beck, 204 Conn. 490, 501 n. 8, 529 A.2d 171
(1987), quoting Rules of Professional Conduct, Preamble (1986); see also Noble v. Marshall, 23 Conn. App. 227, 231, 579 A.2d 594 (1990) ("the Rules of Professional Conduct do not of themselves give rise to a cause of action, even as to an attorney's client"). Accordingly, the court properly concluded that there was no merit to the plaintiffs' claim that there is a material fact in dispute as to whether Braunstein breached the Rules of Professional Conduct.
 Standish v. Sotavento Corp., 58 Conn. App. 789, 796-797, 755 A.2d 910
CT Page 10405 (2000). By their own terms, the Rules do not purport to create civil liability. Even if they did, the plaintiffs cannot use conclusions of a panel which heard evidence which is not before this court as a substitute for evidence they are required to produce to avoid summary judgment.
In this case Attorney Gaide was using the process of post judgment interrogatories for a proper purpose, which was authorized under federal law and state law. The purpose was the payment of a debt. The plaintiffs have produced no evidence that Attorney Gaide had any other improper purpose. And even if he did, it would be irrelevant. He represented a creditor with a sizeable debt and was properly using statutorily mandated procedures to collect that debt. For the foregoing reasons, summary judgment may enter on the First Count of the Complaint in favor of the defendants Paul Gaide and Gaide Associates, LLC.
"In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of' emotional distress], four elements must be established. It must be shown: (1) that the actor intended) to inflict emotional distress or that he knew or should have known that emotional distress was the: likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's; conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986). Whether a defendant's conduct is sufficient to satisfy the requirement that it be: extreme and outrageous is initially a question for the court to determine. Bell v. Board of Education, 55 Conn. App. 400, 410,739 A.2d 321 (1999). Only where reasonable minds disagree does it become an issue for the jury. Id.
Liability for intentional infliction of emotional distress requires conduct that exceeds "`all bounds usually tolerated by decent society. . . .'" Petyan v. Ellis, supra, 200 Conn. at 254 n. 5,510 A.2d 1337, quoting W. Prosser W. Keeton, Torts (5th Ed. 1984) § 12, p. 60. "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'" 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Mellaly v. Eastman Kodak Co., 42 Conn. Sup. 17,19, 597 A.2d 846 (1991). CT Page 10406
The use of the post judgment interrogatories in this case clearly cannot be found to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."See 1 Restatement (Second), Torts § 46, supra. Therefore, the plaintiffs fail to establish one of the requisite elements of intentional infliction of emotional distress and summary judgment may enter on the Second Count of the Complaint in favor of Attorney Gaide and Gaide 
Associates, LLC.
By the court,
 ___________________ Aurigemma, J.